UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


MOHAMED AJAMI,

          Plaintiff,                 CIVIL ACTION NO. 08-12088

       v.                        DISTRICT JUDGE JOHN FEIKENS

CITY OF DEARBORN, DEARBORN      MAGISTRATE JUDGE VIRGINIA M. MORGAN
POLICE DEPARTMENT, DANIEL
SAAB, ANNE KANITRA, ALAN
LEVEILLE, SUZAN ISMAIL
BAYDOUN, HASSAN HARAJLI,
ALPHONSO WALKER, CYRIL HILL,
and CONRAD,[1]

          Defendants.
_____/


**REPORT AND RECOMMENDATION TO GRANT IN PART AND DENY IN PART
DEFENDANTS CITY OF DEARBORN, SAAB, KANITRA AND LEVEILLE'S
MOTION FOR SUMMARY JUDGMENT (D/E #61)**

**I. Introduction**

      This is a 42 U.S.C § 1983 action, arising out of plaintiff's arrest, in which plaintiff alleges

that the defendants violated his constitutional rights. Plaintiff also alleges claims of malicious

prosecution, false arrest/false imprisonment, abuse of process, civil conspiracy and negligence/gross

negligence under Michigan law. A clerk's entry of default has been entered with respect to both

---

[1]As discussed *infra* the only remaining defendants are the City of Dearborn, Saab,
Kanitra, and Leveille. The other individual defendants were dismissed and Plaintiff concedes
that the police department is not an entity subject to suit.

defendants Baydoun and Harajli (D/E #30, #31). Defendants Walker and Conrad have previously been dismissed without prejudice in response to a show cause order (D/E #35), and defendant Hill was voluntarily dismissed by plaintiff (D/E #59). Moreover, in his response to the motion for summary judgment before the court, plaintiff concedes that the Dearborn Police Department should be dismissed as it is not an entity that cannot be sued (D/E #66, p. 18).[2] Therefore, the remaining defendants at issue are defendants City of Dearborn, Saab, Kanitra, and Leveille.

The matter comes before the court on defendants City of Dearborn, Saab, Kanitra and Leveille's Motion for Summary Judgment (D/E #61). Plaintiff filed a response in opposition to that motion (D/E #66) and defendant filed a reply to that response (D/E #67). On March 16, 2010, this court heard oral arguments on the motion and, following the hearing, defendants filed a supplemental brief (D/E #68). For the reasons discussed below, this court now recommends that defendants City of Dearborn, Saab, Kanitra and Leveille's motion for summary judgment be **GRANTED** as to the City of Dearborn and **DENIED** as to the individual defendants. The City of Dearborn is entitled to summary judgment, but a genuine issue of material fact is in dispute with respect to whether there was initially probable cause to arrest plaintiff and the individual defendants' request for summary judgment should be denied.

---

[2]See, *e.g.*, Matthews v. Jones, 35 F.3d 1046, 1049 (6th Cir. 1994) (holding that a municipal police department is not an entity which may be sued under § 1983).

## II.  Background

### A. Facts in the Record

Plaintiff and Defendant Harajli have a history of altercations.  Defendant Harajli was previously convicted of assault against plaintiff, the charge being Assault with the Intent to Commit Great Bodily Harm Less Than Murder and Conspiracy to Commit Assault with the Intent to Commit Great Bodily Harm Less Than Murder contrary to M.C.L. § 750.84 in the Wayne County Circuit Court.  (Register of Actions for Case No. 05-009930-02-FH; attached as Exhibit 3 to D/E #66)  As described in the testimony put forth during Harajli's jury trial, those convictions arose from a November 13, 2004 attack and robbery of plaintiff by Hussein Ali Nasser and Hassan Nasser. Harajli and another man had hired the Nassers to assault and rob plaintiff.  (Excerpts from testimony of Hussein Ali Nasser, pp. 69-96; attached as Exhibit 1 to D/E #66)  The testimony also provided that Harajli had asked a witness, Ramzi Bazzi, to falsely testify during the trial.  (Excerpts from testimony of Ramzi Bazzi, pp. 86-102; attached as Exhibit 2 to D/E #66)

In March of 2005, while the criminal charges against Harajli were still pending, defendant Baydoun, who is Harajli's wife, filed a complaint with the Huron Township Police Department in which she alleged that plaintiff had just appeared at her gas station near Monroe, Michigan, where he pointed his pistol at her while in his black-sport-utility vehicle.  (Original Report, March 6, 2005; attached as part of Exhibit 4 to D/E #66)  In response, a Huron Township Police Officer called the Dearborn Police, described the events plaintiff was alleged to have committed and asked that they arrest plaintiff.  (Original Report, March 6, 2005; attached as part of Exhibit 4 to D/E #66) Members of the Dearborn Police Department immediately responded by proceeding to plaintiff's residence,

where they found him sleeping.  (Original Report, March 6, 2005; attached as part of Exhibit 4 to D/E #66)  The police officers also noted that the vehicle described by Baydoun was cold and there was frost on it.  (Original Report, March 6, 2005; attached as part of Exhibit 4 to D/E #66)  They conveyed that information to the Huron Township Police Department, who agreed with a sergeant from the Dearborn Police Department that they could not arrest plaintiff because they lacked probable cause.  (Original Report, March 6, 2005; attached as part of Exhibit 4 to D/E #66)  The Huron Police Department subsequently determined that plaintiff did not appear anywhere in the gas station's video surveillance footage during the date, time and place he was alleged to have committed the assault.  (Supplemental Report, April 13, 2005; attached as part of Exhibit 4 to D/E #66)  Plaintiff also passed a polygraph in which he denied Baydoun's allegations.  (Supplemental Report, April 29, 2005; attached as part of Exhibit 4 to D/E #66)

On September 2, 2006, while the criminal charges against Harajli were still pending, plaintiff exited his residence to investigate the presence of someone on his lawn.  (Affidavit of Plaintiff, ¶¶ 6-7; attached as Exhibit 5 to D/E #66)  Plaintiff also called 911 during an altercation with the person on his lawn, who was later identified as defendant Alphonso Walker.  (Affidavit of Plaintiff, ¶¶ 7-9; attached as Exhibit 5 to D/E #66)

At 4:45 p.m. on September 2, 2006, the City of Dearborn Police Department received a 911 emergency call from plaintiff.   (Transcript of 911 Calls, p. 2; attached as Exhibit A to D/E #61) During that phone call, plaintiff told the dispatcher that he needed "some police outside [his] home" because there was "some black guy coming every couple days taking pictures of [plaintiff's] home" and that "[plaintiff] got problems with the asshole Harajli"  (Transcript of 911 Calls, p. 2; attached

-4-

as Exhibit A to D/E #61)  At one point, the dispatcher requested that plaintiff describe what the Walker was wearing in case he left the scene and plaintiff responded "[n]o, he can't leave. I hold him right here" (Transcript of 911 Calls, p. 2; attached as Exhibit A to D/E #61) Plaintiff also told the dispatcher that "[Walker] can't go nowhere" (Transcript of 911 Calls, p. 2; attached as Exhibit A to D/E #61)  There was no mention of a gun during the call.  (Transcript of 911 Calls, pp. 2-3; attached as Exhibit A to D/E #61)

Fifteen minutes later, plaintiff's wife called 911 and requested that the police come. (Transcript of 911 Calls, p. 4; attached as Exhibit A to D/E #61)  The dispatcher noted that two officers were responding and plaintiff's wife stated that the police had seen defendant Saab, who was "a bad cop."  (Transcript of 911 Calls, p. 4; attached as Exhibit A to D/E #61)  The dispatcher then told plaintiff's wife that another officer was already on the way.  (Transcript of 911 Calls, p. 4; attached as Exhibit A to D/E #61)

As stated in plaintiff's affidavit, the first police officer to arrive at the scene was defendant Saab and Saab immediately took Walker to a nearby driveway.  (Affidavit of Plaintiff, ¶ 10; attached as Exhibit 5 to D/E #66)  Once they were alone, Saab instructed Walker to say that plaintiff pointed a pistol at Walker.  (Affidavit of Plaintiff, ¶ 10; attached as Exhibit 5 to D/E #66)  Plaintiff's wife's affidavit also provides that she heard Saab tell Walker to state that plaintiff had pointed a gun at Walker.  (Affidavit of Hanadi Ajami, ¶ 6; attached as Exhibit 6 to D/E #66)  Plaintiff states in his affidavit that he never pointed a gun at Walker, though he did have one in his pocket.  (Affidavit of Plaintiff, ¶ 7; attached as Exhibit 5 to D/E #66)  The affidavits of plaintiff's wife and two other men who witnessed the incident from across the street also stated that plaintiff never pointed a gun at

Walker.  (Affidavit of Hanadi Ajami, ¶ 11; attached as Exhibit 6 to D/E #66; Affidavit of Mohamed

Chwaikani, ¶ 2; attached as Exhibit 7 to D/E #66; Affidavit of Abbas Saleh, ¶ 3; attached as Exhibit

8 to D/E #66)

Plaintiff was eventually arrested and, according to his affidavit, Saab whispered to plaintiff

while walking to the police car that "he was not going to like what was about to happen, but all that

could change if he changed his mind about testifying."  (Affidavit of Plaintiff, ¶ 13; attached as

Exhibit 5 to D/E #66)  Plaintiff understood that statement to relate to his future testimony against

Harajli in Harajli's criminal trial.  (Affidavit of Plaintiff, ¶ 13; attached as Exhibit 5 to D/E #66)

Defendant Leveille was the second officer to arrive at plaintiff's house and he would later

write a police report relating to the events that occurred.  (Defendant Leveille's Police Report;

attached as Exhibit B to D/E #61)  In that police report, Leveille wrote that Saab witnessed plaintiff

physically holding Walker while the two men stood on the sidewalk in front of plaintiff's home.

(Defendant Leveille's Police Report; attached as Exhibit B to D/E #61)  The police report also

provided that the two men were arguing loudly with each other and Walker told Saab that plaintiff

had pointed a gun at him.  (Defendant Leveille's Police Report; attached as Exhibit B to D/E #61)

 The police report further states that Saab and Leveille asked plaintiff if he had a gun in his

possession, and plaintiff admitted that he had one in his pocket, while also stating that he had never

removed the gun.  (Defendant Leveille's Police Report; attached as Exhibit B to D/E #61)

According to Leveille's report, Saab and Leveille ordered plaintiff to turn the gun over to them,

which plaintiff did without objection.  (Defendant Leveille's Police Report; attached as Exhibit B

to D/E #61)  The police report also provided that plaintiff was extremely angry and excited, and

Saab and Leveille had to repeatedly instruct him to not yell at Walker.  (Defendant Leveille's Police Report; attached as Exhibit B to D/E #61)  Plaintiff eventually told the police that Walker had been taking photographs of plaintiff's house "for the past couple days" and that plaintiff decided to confront him.  (Defendant Leveille's Police Report; attached as Exhibit B to D/E #61)   Plaintiff denied having removed his gun from his pocket during the confrontation and he presented police a carrying concealed weapons permit (CCW) valid for the State of Ohio.  (Defendant Leveille's Police Report; attached as Exhibit B to D/E #61)  Walker told the police that he worked as a process server for an attorney named Cyril Hall and that he was merely attempting to serve legal documents on plaintiff in a civil matter when plaintiff came out of the front door pointing a gun at him and threatening to kill him if he did not cease taking pictures of the house.  (Defendant Leveille's Police Report; attached as Exhibit B to D/E #61)  Saab and Leveille asked Walker to describe the gun in question and the description Walker gave matched the gun retrieved from plaintiff's pocket.  (Defendant Leveille's Police Report; attached as Exhibit B to D/E #61)   The police also asked Walker to tell them which hand plaintiff had used to point the gun at him and Walker answered that plaintiff pointed the gun at him with his right hand.  (Defendant Leveille's Police Report; attached as Exhibit B to D/E #61)  Later, the police asked plaintiff which hand he used for shooting his gun and plaintiff answered that he used his right hand.  (Defendant Leveille's Police Report; attached as Exhibit B to D/E #61)   The Officers arrested Plaintiff for the crime of felonious assault.  (Defendant Leveille's Police Report; attached as Exhibit B to D/E #61)

Plaintiff's wife's affidavit provides that she notified both Leveille and Saab that she and two other witnesses standing close by had observed the entire incident, and that plaintiff had not

committed assault.  (Affidavit of Hanadi Ajami, ¶ 8; attached as Exhibit 6 to D/E #66)  She also advised them that her husband had been beaten by men hired by Harajli, that Harajli's wife and other Harajli operatives had falsely accused plaintiff of identical conduct on two prior occasions, that Walker worked for Harajli,  and that this story was yet another fabrication designed to stop her husband's testimony against Harajli.  (Affidavit of Hanadi Ajami, ¶¶ 9-10; attached as Exhibit 6 to D/E #66)  Leveille refused to hear her statements and told her to "shut up."  (Affidavit of Hanadi Ajami, ¶ 8; attached as Exhibit 6 to D/E #66)  Saleh and Chwaikani, also provided affidavits stating that they had wanted to talk to the police, but they were told to "shut up" by Leveille.  (Affidavit of Mohamed Chwaikani, ¶ 3; attached as Exhibit 7 to D/E #66; Affidavit of Abbas Saleh, ¶ 6; attached as Exhibit 8 to D/E #66)

The next day after the arrest, defendant Kanitra began investigating the incident and she would later write a police report detailing that investigation.  (Defendant Kanitra's Police Report; attached as Exhibit C to D/E #61)  In that police report, Kanitra wrote that she first spoke to Mark Haidar, the attorney representing plaintiff.  (Defendant Kanitra's Police Report; attached as Exhibit C to D/E #61)  The police report also stated that Haidar told Kanitra that plaintiff had recently been a victim to a severe beating and that as a result he was very fearful of being assaulted again, and that plaintiff maintained that he did not point a gun at Walker during the incident.  (Defendant Kanitra's Police Report; attached as Exhibit C to D/E #61)    Kanitra's police report also provides that she spoke to plaintiff's neighbor, Mohamad Chwaikani, who had witnessed the incident from across the street along with his friend Abbas Saleh.  (Defendant Kanitra's Police Report; attached as Exhibit C to D/E #61)  Chwaikani told Kanitra that they had witnessed Hall taking photos of neighborhood

houses and that when Saleh asked Walker what he was doing and that Walker replied that he worked for a mortgage company. (Defendant Kanitra's Police Report; attached as Exhibit C to D/E #61) Chwaikani also told Kanitra that he witnessed plaintiff and Walker talking, and that he never saw Plaintiff point a gun at Mr. Walker. (Defendant Kanitra's Police Report; attached as Exhibit C to D/E #61) Kanitra also spoke with Saleh and Saleh confirmed what Chwaikani had said, with the only difference being that he heard Walker tell plaintiff that Walker was a process server. (Defendant Kanitra's Police Report; attached as Exhibit C to D/E #61) Kanitra then spoke to plaintiff's wife and she confirmed plaintiff's version of events. (Defendant Kanitra's Police Report; attached as Exhibit C to D/E #61) Plaintiff's wife also told Kanitra that Saab was involved in a case against plaintiff. (Defendant Kanitra's Police Report; attached as Exhibit C to D/E #61) Lastly, Kanitra spoke with Walker, who told her that he had been attempting to serve legal documents on plaintiff when plaintiff burst from the front door of the house, pointed a gun at him, and said "[c]ome here, I'll kill you, you were in my yard yesterday, you nigger you don't serve papers in my yard, you don't come over here you nigger." (Defendant Kanitra's Police Report; attached as Exhibit C to D/E #61) Walker also told Kanitra that Walker told plaintiff that when he tried to leave, plaintiff prevented him at gunpoint from doing so, saying "you are not going anywhere, you are making me mad." (Defendant Kanitra's Police Report; attached as Exhibit C to D/E #61) Walker also provided Kanitra with a written statement essentially providing the same information as described in her police report. (Walker's Statement dated September 2, 2006; attached as Exhibit D to D/E #61)

Plaintiff's wife's affidavit provides that, when she was interviewed by Kanitra, she described what she had seen, stated that she believed that Saab and Walker had concocted their story at the

behest of Harajli and asked to proceed with a citizen's complaint against Saab. (Affidavit of Hanadi Ajami, ¶¶ 11-12; attached as Exhibit 6 to D/E #66) Kanitra then told plaintiff's wife that it was against the Dearborn Police Department's policy to take citizen's complaints for police misconduct when the investigation had already concluded a civilian was being charged. (Affidavit of Hanadi Ajami, ¶ 12; attached as Exhibit 6 to D/E #66) Saleh and Chwaikani's affidavits confirm that, when they were interviewed by Kanitra, they told her that they had never seen plaintiff point a gun at Walker and that they had seen the entire incident. (Affidavit of Mohamed Chwaikani, ¶ 4; attached as Exhibit 7 to D/E #66; Affidavit of Abbas Saleh, ¶¶ 3-7; attached as Exhibit 8 to D/E #66)

Kanitra subsequently submitted an investigator's report to the Wayne County Prosecutor's Office on September 5, 2006. (Kanitra's Investigator's Report; attached as Exhibit E to D/E #61) That report was similar to her police report, but it did omit plaintiff's wife's statements regarding Saab. (Kanitra's Investigator's Report; attached as Exhibit E to D/E #61) The investigator's report also incorporated information from Leveille's police report. (Kanitra's Investigator's Report; attached as Exhibit E to D/E #61)

The Wayne County Prosecutor's Office authorized the charges of felonious assault and carrying a firearm while committing a felony against plaintiff. On September 29, 2006, Plaintiff was formally arraigned in the 19th District Court before Judge William C. Hultgren. (Arraignment Transcript; attached as Exhibit 10 to D/E #66) During the arraignment, the following exchange occurred:

> **The Court:** Okay, well I would just gratuitously offer that I know that at the time of the writ, even though I signed the writ it never came before me because the on-duty prosecutor at the time,

a young lady - I do not know who it was - but she had thrown out that, "I can't believe that they ever arrested him and that the arresting officer was an officer of the Dearborn Police Department who gets himself in trouble every time he reports for duty. And he has allegedly business ties with Mr. Harajli, which makes it even uglier or potentially uglier" -- which makes it hard for me to believe that you people are standing here with reference to this complaint. It will be a personal bond. We'll make it a $100.00 personal bond.

**Defense Counsel:** Thank you, your honor.

**The Court:** And I - that $100.00 is probably too much.

**Defense Counsel:** Thank you, your honor.

**The Court:** Okay, your all set. Don't let them scare you away from testifying.

[Arraignment Transcript, pp. 8-9; attached as Exhibit 10 to D/E #66]

On November 3, 2006, Judge Somers in Dearborn's 19th District Court held a Preliminary Examination. (Preliminary Hearing Transcript; attached as Exhibit F to D/E #61) The only witness to testify at the preliminary hearing was Walker and he repeated a similar version of events he told to the Dearborn Police Department. (Preliminary Hearing Transcript, pp. 4-33; attached as Exhibit F to D/E #61) Following the testimony and arguments, Judge Somers found that a reasonable trier of fact could conclude that plaintiff was guilty of the crimes of felonious assault and carrying a firearm while committing a felony, and he bound plaintiff over to the Wayne County Circuit Court for trial. (Preliminary Hearing Transcript, pp. 41-42; attached as Exhibit F to D/E #61)

On February 26, 2007, Judge Ryan in the Wayne County Circuit Court conducted a Waiver Trial. (Transcript of Waiver Trial; attached as Exhibit G to D/E #61) Both Walker and Leveille

testified during the trial.  (Transcript of Waiver Trial, pp. 5-15, 27-36; attached as Exhibit G to D/E #61)  Following the testimony, the prosecution argued that Walker's testimony, plaintiff's statement on his 911 call that he was "holding" Walker, and the fact that police retrieved a gun from plaintiff's pocket at the scene all supported the conclusion that plaintiff had in fact pointed a gun at Walker during the argument and thus was guilty of the crimes with which he was charged (Transcript of Waiver Trial, p. 36; attached as Exhibit G to D/E #61)  Defense counsel argued that the evidence presented by the prosecution did not prove his client guilty beyond a reasonable doubt.  (Transcript of Waiver Trial, p. 36; attached as Exhibit G to D/E #61)  Judge Ryan subsequently found that plaintiff was not guilty beyond a reasonable doubt of the crimes with which he was charged and ordered his acquittal.  (Transcript of Waiver Trial, p. 37; attached as Exhibit G to D/E #61)

**B. Procedural History**

On May 13, 2008, plaintiff filed the complaint in this matter (D/E #1).  In that complaint, plaintiff alleged claims against all defendants, under a conspiracy theory, for violation of 42 U.S.C. § 1983.  Plaintiff also alleged state law claims of malicious prosecution (two counts: one predicated on the state criminal proceeding and a second based upon a dismissal of a civil action filed against him in federal court in 2006), false arrest, abuse of process, civil conspiracy, and negligence/gross negligence.

On March 4, 2010, defendants Saab, Leveille, Kanitra, and the City of Dearborn filed the motion for summary judgment pending before the court (D/E #61).  In that motion, those defendants argue that the individual defendants are entitled to qualified immunity and summary judgment because there was probable cause to arrest plaintiff.  Defendants also argue that the City of Dearborn

is entitled to summary judgment because, under 42 U.S.C. § 1983, it cannot be held vicariously liable for the actions of its employees and plaintiff cannot demonstrate that any policy of the city caused the alleged constitutional deprivation.

On March 26, 2010, plaintiff filed a response to defendants' motion for summary judgment (D/E #66). In that response, plaintiff argues that qualified immunity does not protect those who knowingly violate the law and that, under the totality of the circumstances, there was no probable cause to arrest or charged plaintiff. Plaintiff also argues that the City of Dearborn had a policy which prohibited citizens from pursuing legal recourse against the ongoing misconduct of its police department and that the policy amounts to deliberate indifference to plaintiff's constitutional rights.

On March 29, 2010, defendants filed a reply to plaintiff's response (D/E #67). In that reply, defendants again argue that there was probable cause to arrest plaintiff and that the individual defendants acted properly in arresting and charging plaintiff.

On March 31, 2010, this court heard oral arguments on defendants' motion for summary judgment.

On April 1, 2010, defendants filed a supplemental brief in which they argue that plaintiff's complaint should be dismissed pursuant to the doctrine of collateral estoppel.

**III.  Standard of Review**

Defendants move for summary judgment pursuant to Federal Rule of Civil Procedure 56(b), which states that "[a] party against whom a claim, counterclaim, or cross-claim is asserted or a declaratory judgment is sought may, at any time, move without or without supporting affidavits for a summary judgment in the party's favor as to all or any part thereof."  Summary judgment is

appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).

In deciding a motion for summary judgment, the court must view the evidence and draw all reasonable inferences in favor of the non-movant.  See Matsushita Electric Industrial Co., Ltd. et al. v. Zenith Radio Corp., et. al., 475 U.S. 547, 587, 106 S. Ct. 1348, 1356 (1986); see also B.F. Goodrich Co. v. U.S. Filter Corp., 245 F.3d 587, 591-92 (6th Cir. 2001).  The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact.  Once the moving party has carried his burden, the party opposing the motion "must come forward with specific facts showing that there is a genuine issue for trial."  Matsushita, 475 U.S. at 587, 106 S.Ct. 1348.  The opposing party cannot merely rest upon the allegations contained in his pleadings.  Rather, he must submit evidence demonstrating that material issues of fact exist.  Banks v. Wolfe County Bd. of Educ., 330 F.3d 888, 892 (6th Cir. 2003); Fed. R. Civ. P. 56(e).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  Matsushita, 475 U.S. at 587, 106 S.Ct. 1348 (quoting First National Bank of Arizona v. Cities Service Co., 391 U.S. 253, 289, 88 S.Ct. 1575, 1592 (1968)).

**IV.  Discussion**

**A. Individual Defendants**

Defendants Saab, Leveille and Kanitra argue that they are entitled to summary judgment and qualified immunity as to all the claims against them.  Qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation."  Saucier v. Katz, 533 U.S. 194, 200; 121 S.Ct.

2151; 150 L.Ed.2d 272 (2001) *overruled in part by* <u>Pearson v. Callahan</u>, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009)**,** (quoting <u>Mitchell v. Forsyth</u>, 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985)).  The privilege is an immunity from suit and not a mere defense to liability.  <u>Saucier</u>, 533 U.S. at 200.  As a result, courts have "repeatedly have stressed the importance of resolving immunity questions at the earliest possible stage in litigation."  <u>Hunter v. Bryant</u>, 502 U.S. 224, 227, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (per curiam).

"A court should not grant summary judgment on the issue of qualified immunity if there exists a genuine issue of material fact, 'involving an issue on which the question of immunity turns, such that it cannot be determined before trial whether the defendant did acts that violate clearly established rights.'" <u>Flint ex rel. Flint v. Kentucky Dept. of Corrections</u>, 270 F.3d 340, 346-347 (6th Cir. 2001) quoting <u>Poe v. Haydon</u>, 853 F.2d 418, 425-426 (6th Cir. 1988).  A court required to rule upon the qualified immunity issue must consider whether the facts alleged show the officer's conduct violated a constitutional right and whether that constitutional right was clearly established. <u>Saucier</u>, 533 U.S. at 201.  In making those inquiries, courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."  <u>Pearson</u>, 129 S.Ct. at 818.  "This inquiry, it is vital to note, must be undertaken in light of the specific context of the case, not as a broad general proposition; and it too serves to advance understanding of the law and to allow officers to avoid the burden of trial if qualified immunity is applicable."  <u>Saucier</u>, 533 U.S. at 201.

Here, defendants' motion for qualified immunity and summary judgment is limited to the assertion that there was probable cause to arrest plaintiff for felonious assault and the motion completely fails to distinguish between the three different individual defendants, despite the fact that the three defendants have three different factual circumstances. Defendants' motion also fails to discuss plaintiff's specific claims, despite the fact that some of those claims could survive a determination that there was initially probable cause to arrest plaintiff.[3] In any event, this court need not discuss the ramifications of the limited nature of defendants' motion because the sole argument defendants do make should be rejected.[4]

The individual defendants assert that there was probable cause to arrest plaintiff for felonious assault. "For Fourth Amendment purposes: 'Probable cause necessary to justify an arrest is defined as whether at that moment the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing

---

[3]For example, "[w]hen subsequent developments disprove the correctness of a previous police determination that probable cause exists, ... the police no longer have justification under the Fourth Amendment to continue the incarceration, and must release the suspect." Peet v. City of Detroit, 502 F.3d 557, 565 (6th Cir . 2007).

[4]Defendants do argue in a supplemental brief that plaintiff should be collaterally estopped from bringing this action because of the determination made, at the preliminary examination, that there was probable cause to believe that plaintiff had committed felonious assault. However, nothing in that brief sets out any transaction, occurrence, or event that happened after the filing of the motion for summary judgment and, consequently, it is not a proper supplemental brief. Defendants do cite a relatively recent case in support of that supplemental brief, Molnar v. Care House, No. 08-2189, 2009 WL 5125520 (6th Cir. December 29, 2009), but that case was decided prior to defendants filing their motion for summary judgment. Moreover, Molnar is distinguishable from this case because the witness who testified at the preliminary examination in that case was a third-party whereas the witness in this case, Walker, is alleged to have conspired with defendants and to have been specifically directed to lie by Saab.

that the [arrestee] had committed or was committing an offense." <u>Wilson v. Morgan</u>, 477 F.3d 326, 333 (6th Cir. 2007) (quoting <u>Radvansky v. City of Olmstead Falls</u>, 395 F.3d 291, 302 (6th Cir. 2005)) (alteration in original).

Under Michigan law, felonious assault is an assault "with a gun . . . or other dangerous weapon "without intending to commit murder or to inflict great bodily harm less than murder[.]" M.C.L. § 750.82. "An assault is defined as any intentional unlawful offer of corporal injury to another person by force, or force unlawfully directed toward the person of another, under circumstances which create a well-founded apprehension of imminent contact, coupled with the apparent present ability to accomplish the contact." <u>Espinoza v. Thomas</u>, 189 Mich. App. 110, 119, 472 N.W.2d 16 (1991) (citations omitted). "A battery is the wilful and harmful or offensive touching of another person which results from an act intended to cause such a contact. Protection of the interest in freedom from unintentional and unpermitted contacts with the plaintiff's person extends to any part of his body." <u>Espinoza v. Thomas</u>, 189 Mich. App. 110, 119, 472 N.W.2d 16 (1991) (citations omitted).

Defendants argue that probable cause existed to arrest plaintiff for felonious assault on the basis of the 911 calls, Walker's statements to the police, and plaintiff's demeanor. As described above, the transcript of plaintiff's 911 call has plaintiff saying, with respect to Walker, that "he can't leave. I hold him right here" and "[he] can't go nowhere" (Transcript of 911 Calls, p. 2; attached as Exhibit A to D/E #61) According to Leveille's police report: (1) Walker told the police that plaintiff had been holding him at gunpoint with a gun in plaintiff's right hand; (2) plaintiff was right-handed;

(3) Walker described the gun found in plaintiff's pocket; and (4) plaintiff was acting, hostile, excited, and angry. (Defendant Leveille's Police Report; attached as Exhibit B to D/E #61)

However, defendants' motion and reply ignore evidence demonstrating that defendants conspired to manufacture probable cause. As provided in plaintiff's evidence, Saab directed Walker to lie and say that plaintiff pointed a gun at Walker. (Affidavit of Plaintiff, ¶ 10; attached as Exhibit 5 to D/E #66; Affidavit of Hanadi Ajami, ¶ 6; attached as Exhibit 6 to D/E #66) Plaintiff's evidence also provides that Leveille prevented eye witnesses to the incident from providing statements that plaintiff never pointed a gun at Walker and that Walker had a history with both Harajli and plaintiff. (Affidavit of Hanadi Ajami, ¶¶ 8-12; attached as Exhibit 6 to D/E #66; Affidavit of Mohamed Chwaikani, ¶¶ 2-3; attached as Exhibit 7 to D/E #66; Affidavit of Abbas Saleh, ¶¶ 3, 6; attached as Exhibit 8 to D/E #66) Moreover, this court would note that the 911 call transcript merely states that plaintiff was holding Walker without mentioning any gun (Transcript of 911 Calls, pp. 2-3; attached as Exhibit A to D/E #61), and that Leveille's police report specifically states that plaintiff was only physically holding Walker when the police arrived. (Defendant Leveille's Police Report; attached as Exhibit B to D/E #61)

Viewing the above evidence and the entire record in a light most favorable to plaintiff, as this court must, a rational trier of fact could find that there was no probable cause to arrest plaintiff. Consequently, there is a genuine issue of material fact in dispute with respect to probable cause and the individual defendants are not entitled to summary judgment on that issue.

**B. Municipal Defendant**

The City of Dearborn moves for summary judgment on the basis that plaintiff has failed demonstrate a claim for municipal liability and, instead, merely alleges a respondeat superior theory of liability. A municipality cannot be liable for the constitutional torts of its employees; that is, it cannot be liable on a respondeat superior theory. Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); see also Powers v. Hamilton County Public Defender Com'n, 501 F.3d 592, 607 (6th Cir. 2007). Rather, liability will attach only where the plaintiff establishes that the municipality engaged in a "policy or custom" that was the "moving force" behind the deprivation of the plaintiff's rights. Monell, 436 U.S. at 694; see also Doe v. Claiborne County, 103 F.3d 495, 507 (6th Cir.1996) ("Under Monell, the [defendants] cannot be found liable unless the plaintiff can establish that an officially executed policy, or the toleration of a custom ... leads to, causes, or results in the deprivation of a constitutionally protected right.").

The Monell Court described a municipal policy as including "a policy statement, ordinance, regulation, or decision officially adopted and promulgated...." 436 U.S. at 690. An actionable "custom," in contrast, "has not received formal approval through . . . official decisionmaking channels." Monell, 436 U.S. at 690-91. A § 1983 plaintiff may establish the existence of a custom by showing that policymaking officials knew about and acquiesced in the practice at issue. Memphis, Tenn. Area Local, Am. Postal Workers Union v. City of Memphis, 361 F.3d 898, 902 (6th Cir.2004). However, where a municipal-liability claim is premised on an "inaction theory," the plaintiff must prove (1) the existence of a clear and persistent pattern of violating federal rights; (2) notice or constructive notice on the part of defendants; (3) the defendants' tacit approval of the unconstitutional conduct, such that their deliberate indifference in failing to act can be said to

amount to an official policy of inaction; and (4) that the defendants' custom was the "moving force," or direct causal link for the constitutional deprivation.  Doe, 103 F.3d at 508; see also Thomas v. City of Chattanooga, 398 F.3d 426, 429 (6th Cir.2005) (applying Doe factors where the plaintiff alleged that the Chattanooga police department had a custom of tolerating the use of excessive force against detained suspects); Garretson v. City of Madison Heights, 407 F.3d 789, 796 (6th Cir. 2005) (applying Doe factors where the plaintiff alleged that the city had a custom of failing to provide medical treatment to pre-arraignment detainees).

Here, the only allegations regarding a policy, practice or custom of the City of Dearborn is found in Count I of plaintiff's complaint, which provides:

> the City of Dearborn and the City of Dearborn Police Department were indifferent to the continual course of illegal activity, torts and constitutional violations committed by Saab, Leveille and other officers, such that this behavior rose to the level of a custom, policy or practice of the City and its Police Department.

[Complaint, ¶ 74][5]

Plaintiff may establish municipal liability under § 1983 upon a showing that the City had "a custom of tolerance or acquiescence of federal rights violations." Thomas, 398 F.3d at 429.  See also Aureus Holdings, Ltd. v. Detroit City, 303 Fed. Appx. 265, 270-271 (6th Cir. 2008).   To prevail on such a theory, however, plaintiff must demonstrate that: there was a clear and persistent pattern of illegal activity; the City had notice of it; the City tacitly approved the unconstitutional activity such that its deliberate indifference amounts to an official policy of inaction; and this custom

---

[5]Plaintiff does assert, in his response, that the City of Dearborn had a policy of prohibiting citizens from pursing legal recourse against the ongoing misconduct of police officers, but there is no such allegation in the complaint.

or policy of inaction was the moving force behind the constitutional deprivation. <u>Thomas</u>, 398 F.3d at 429. Deliberate indifference remains distinct from mere negligence and, where a city does create reasonable policies, but negligently administers them, there is no deliberate indifference and therefore no § 1983 liability. <u>Gray v. City of Detroit</u>, 399 F.3d 612, 618 n.1 (6th Cir. 2005) (citing <u>Molton v. City of Cleveland</u>, 839 F.2d 240, 247 (6th Cir. 1988)).

In this case, however, plaintiff has merely alleged the existence of such a policy of inaction or "de facto policy" and has produced no evidence of a pattern of similar activity. Such bald allegations are clearly insufficient to forestall summary judgment. <u>See</u>, <u>e.g.</u>, <u>Aureus Holdings, Ltd.</u>, 303 Fed. Appx. at 270-271 (granting summary judgment to municipal defendant where the plaintiff only responded to motion for summary judgment with allegations from complaint.

Along with the response to defendants' motion for summary judgment, plaintiff's counsel provided an affidavit pursuant to Fed. R. Civ. P. 56(f) describing the need for more discovery on this issue prior to any ruling. Fed. R. Civ. P. 56(f) provides that "If a party opposing the motion [for summary judgment] shows by affidavit that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) deny the motion; (2) order a continuance to enable affidavits to be obtained, depositions to be taken, or other discovery to be undertaken; or (3) issue any other just order." The party supplying the affidavit must state why discovery is necessary. and "state with some precision the materials he hopes to obtain with further discovery, and exactly how he expects those materials would help him in opposing summary judgment." <u>Summers v. Leis</u>, 368 F.3d 881, 887 (6th Cir. 2004).

Here, plaintiff's counsel's affidavit only states in very general terms the items plaintiff hopes to obtain. For example, counsel avers that she hopes to depose Saab's deposition and "produce evidence to pursue a municipal claim against the City of Dearborn as it relates to a failure to train, investigate and discipline." (Affidavit of Craig Tank, ¶¶ 2-7; attached as Exhibit 11 to D/E #66) Plaintiff fails to identify any specific evidence that he believes will be obtained during discovery or exactly how he expects those materials would help him in opposing summary judgment. Given the absence of such statements, the court need not allow any further discovery and it should grant summary judgment in favor of the City of Dearborn.

## V. Conclusion

For the reasons discussed above, the court recommends that defendants City of Dearborn, Saab, Kanitra and Leveille's motion for summary judgment be **GRANTED** as to the City of Dearborn and **DENIED** as to the individual defendants.

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. Thomas v. Arn, 474 U.S. 140 (1985); Howard v. Secretary of HHS, 932 F.2d 505, 508 (6th Cir. 1991); United States v. Walters, 638 F.2d 947, 949-50 (6th Cir. 1981). The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. Willis v. Secretary of HHS, 931 F.2d 390, 401 (6th Cir. 1991); Smith v. Detroit Fed'n of Teachers Local 231, 829 F.2d 1370, 1373 (6th Cir. 1987).

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be no more than 20 pages in length unless, by motion and order, the page limit is extended by the court. The response shall address each issue contained within the objections specifically and in the same order raised.

S/Virginia M. Morgan_____
Virginia M. Morgan
United States Magistrate Judge

Dated: May 25, 2010

---

**PROOF OF SERVICE**

The undersigned certifies that the foregoing document was served upon counsel of record via the Court's ECF System and/or U. S. Mail on May 25, 2010.

s/Jane Johnson
Case Manager to
Magistrate Judge Virginia M. Morgan